| | |
|---|---|
| Darrell Morris, | : |
|     Plaintiff, | : |
| | : |
| v. | :   Case No. 05cv848 (JBA) |
| | : |
| Yale University School | : |
| of Medicine, | : |
|     Defendant. | : |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. # 36]**

Plaintiff Darrell Morris, an African-American male and former medical student at the Yale University School of Medicine ("Yale" or "the School"), brought this action in connection with his dismissal from Yale, asserting a claim under the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981 (Count 1), and common law claims for breach of contract, negligent misrepresentation, breach of the covenant of good faith and fair dealing, and promissory estoppel (Counts 2-5). In April 2006, the Court denied defendant's Motion to Dismiss plaintiff's common law claims, which challenged supplemental jurisdiction and viability on grounds that "Connecticut permits a student to challenge his dismissal from an educational program only in very limited circumstances." See Ruling on Def. Mot. to Dismiss [Doc. # 28].

Defendant now moves for summary judgment [Doc. # 36], contending there is no evidence to support a claim that plaintiff's dismissal was racially motivated and that

supplemental jurisdiction over the common law claims should be declined or, alternatively, arguing that the common law claims fail on their merits.  For the reasons that follow, defendant's Motion will be granted.

## I.    Factual Background

The record establishes the following facts.  Plaintiff matriculated at Yale in August 2000 and was ultimately dismissed as of August 1, 2004.  Angoff Aff. [Doc. # 39] ¶¶ 3-4.  In February 2001, at the end of his first semester, plaintiff was informed that he had failed the Molecules to Systems course.  Id. ¶ 5.  Defendant contends that it is Yale's policy that after a failure, it is the student's responsibility to contact the professor and make a plan for "remediation" within thirty days following the notice of the failure, which plaintiff did not do, id ¶¶ 6-7, whereas plaintiff claims that "by not contacting the professor within thirty (30) days, this simply let the Dean of Student Affairs know that [he] had failed the course [breaking the confidentiality code]" and that "[i]n fact, [he] did contact the professor in order to be retested," Morris Aff. [Doc. # 45-3] ¶ 4.  In plaintiff's second semester of the 2000-2001 academic year, he received tutoring in his basic science course, and his tutor reported that plaintiff had a short attention span and did not spend enough time reading the course materials to master the subject matter.  Angoff Aff. ¶ 11.  Over the summer of 2001,

plaintiff received tutoring from Professor Herbert Chase in the subject matter of the Molecules to Systems course, id. ¶ 9; plaintiff attests that Professor Chase certified him as having mastered heart and lung physiology, the two areas in which plaintiff claims he received tutoring, Morris Aff. ¶ 10. Also in the summer of 2001, Professor Margaret Bia complained that plaintiff was not attending tutorials in his Doctor-Patient Encounter course, which is a "required component of medical education at [Yale]," Angoff Aff. ¶ 11; plaintiff states that attendance at courses/tutorials at Yale in the first two years is not required, Morris Aff. ¶¶ 5, 8.

About a year later, in the summer of 2002, plaintiff was involved in "an incident on campus when a white male medical resident accosted [him] and questioned [him] in an intimidating manner about [his] entrance into the dormitory when [he] was then living," id. ¶ 16. The resident's name was Dr. Childs, and plaintiff attests that when he attempted to enter his building with groceries and a rug he had bought for his apartment, Dr. Childs "physically blocked the entrance and demanded to see [his] identification," although Dr. Childs did not live there and was there just to use the gym, id. The police were ultimately called and the "incident was soon over," but plaintiff claims that "[b]y his manner and gestures, this resident appeared to be questioning [plaintiff's] entrance into the dormitory because of [his] race,"

id. Plaintiff details a complaint he made to Dean of Student Affairs Angoff, who told plaintiff she would look into the incident; he also states that he believes that Dean Angoff "could have been concerned about [his] statement that [he] was contemplating writing an article for the student newspaper" "about racism [and] the different ways it is manifested in [their] profession and at Yale," id. ¶ 17.[1]

Subsequently, in August 2002, plaintiff failed Step I of the United States Medical Licensing Exam ("Step I"), the passing of which is required before a student can graduate from Yale. See Angoff Aff. ¶ 12. The Yale Medical School Handbook provides, inter alia, "[a]ll Yale medical students are required to pass Steps I and II in order to graduate. If you fail Step I, you may reschedule it at any time before May of the third year. Three failures of Step I will require consultation with the Progress Committee, and only in extraordinary circumstances will the student receive permission to take it a fourth time. In the absence of that permission, the student will be terminated from the medical school." Handbook [Doc. # 39, Ex. A]. The Handbook also states that "[i]f Step I is failed more than once, the student will be asked to discontinue clinical rotations until he or she takes and passes the exam." Id.

---

[1] Plaintiff was a journalist before matriculating at medical school.

4

In August and September 2002, plaintiff began his clinical rotations/clerkships and received a "High Pass" in his first two – Obstetrics/Gynecology and Surgery C. Morris Aff. ¶ 11. However, plaintiff next performed his rotation in Internal Medicine I and received a conditional pass; his performance was described as "failing," and he was required to retake the rotation. Angoff Aff. ¶¶ 15-16; Morris Aff. ¶ 12. In the spring semester 2003, plaintiff was assigned to perform a remedial Internal Medicine I rotation under Dr. Barry Wu, Angoff ¶ 18; plaintiff attests that he thought this tutorial was "optional," Morris Dep. at 172, and that he "was advised by Dean Angoff to take the tutorial because Dr. Wu was noted to be a good instructor and because he would be transferring to another service and would not be available for this tutorial at any other future time," Morris Aff. ¶ 14. Plaintiff states that he did not initially want to take the tutorial because it interrupted his study for the Step 1 exam, he observes that the evaluation form completed by Dr. Wu states that it is for "an elective subinternship," which is usually only done by fourth-year medical students, and he also notes that the tutorial with Dr. Wu does not appear on his transcript because it was not official. See id. ¶¶ 14, 27. In any event, Dr. Wu described plaintiff's performance in the rotation as "unsatisfactory," and stated that "plaintiff's clinical skills were at the level of a first-year

student," that "he was not ready to progress to his third year," and "that plaintiff needed 'significant improvement' in the following areas: fund of knowledge, obtaining patient histories, physical examination skills, presentations of patients, clinical reasoning, attention to detail, and professionalism."  Angoff Aff. ¶ 19.  Plaintiff attests that upon beginning his tutorial with Dr. Wu, "it was immediately apparent to [plaintiff] that [Dr. Wu] was hostile toward [him] for some reason," "he was negative from the beginning," "[h]is demeanor was not friendly and he seemed to be looking [plaintiff] up and down when talking [and] was immediately unfriendly toward [plaintiff] and had a very skeptical look when [plaintiff] stated what [his] objective for the tutorial was."  Morris Aff. ¶ 24.  Plaintiff also believes that his question-answering style and Dr. Wu's teaching style conflicted, that an intern also in the tutorial told Morris that "it was obvious" to him that Morris "kn[e]w this stuff," but that plaintiff shouldn't "pause like that with Dr. Wu.  Just say something right away," and another intern told plaintiff that "she did not know the answers to some of the questions that Dr. Wu asked [plaintiff]."  Id. ¶ 25.

According to Dean Angoff, the School has a "Progress Committee," which is "charged with reviewing the progress of students and deciding whether each student should progress into the next year [and] has the authority to place students on

academic probation and to dismiss them." Angoff Aff. ¶ 20.
Accordingly, when the Progress Committee met on June 9, 2003, it
decided to place plaintiff on academic probation because of his
"difficulty in acquiring basic knowledge and mastering basic
skills during his first two years of medical school." Id. ¶ 21.
According to Dean Angoff, because "normally a student who has
completed two years of medical education would begin clinical
rotations, in which the student would assist licensed physicians
in treating patients," the School "wishes to have its students
demonstrate competence in basic medicine prior to beginning these
rotations" and thus "the Progress Committee determined that
plaintiff would be required to pass the Step I exam by no later
than July 31, 2003, in order to demonstrate his competence to
participate in the clinical rotations during his third year,
beginning in the fall of 2003." Id. ¶ 22. Notes from the June
9, 2003 Progress Committee meeting indicate that this was "the
first time academic probation [was] used." See 6/9/03 Minutes
[Doc. # 45, Ex. 6] at 00739. The parties do not dispute that as
of July 31, 2003, plaintiff had not taken the Step I exam again,
although plaintiff contends that "[d]uring a meeting with Dean
Angoff in 2003 she stated that there was an informal 2006
deadline for all requirements, Step I, II examinations and
courses; a six year limit." Morris Aff. ¶ 32.

In any event, on September 10, 2003, plaintiff took and

failed the Step I exam for a second time.  Angoff Aff. ¶ 24.

Thus, on October 27, 2003, the Progress Committee "reviewed

plaintiff's academic record and unanimously voted to dismiss

him." Id. ¶ 25.  Plaintiff appealed his dismissal to Interim

Dean Dennis Spencer, claiming lack of notice that failure of the

Step I exam for a second time would result in dismissal, and the

School established a Grievance Committee to hear plaintiff's

appeal, id. ¶ 26, which was ultimately successful: the Grievance

Committee "wished to give plaintiff another opportunity to

demonstrate his competence before final dismissal" and therefore

recommended "that plaintiff be reinstated to academic probation

and that he be required to demonstrate his competence by passing

the Step I exam before beginning any clinical work," id. ¶ 27.

Thus, on March 3, 2004, Dean Angoff informed plaintiff by e-mail

that "the decision of the appeals committee was to give

[plaintiff] another chance to successfully complete the

requirements to graduate from Yale Medical School [and] the first

step must be passing Step I of the USMLE."  3/3/04 E-mail [Doc.

#39, Ex B].  Dean Angoff informed plaintiff that he "must sit for

the Step I examination no later than June 15, 2004" and that "in

the unfortunate event that [plaintiff] fail[ed] Step I this time,

[he] need[ed] to know that [he] [would] be dismissed from the

school." Id.  Plaintiff acknowledged receipt of Dean Angoff's

March 3, 2004 e-mail by reply e-mail in which he asked for

additional time in which to take the exam, as there was a review course he wanted to take which ended June 18 and that he would "take the test immediately afterward," which request Dean Angoff granted, telling plaintiff that he "must take the Step I exam by June 30, 2004." 3/4/04 E-mail [Doc. # 39, Ex. C]. Interim Dean Dennis Spencer also sent a letter to plaintiff, dated March 5, 2004, in which Dean Spencer explained that in light of the report of the Grievance Committee, plaintiff would be reinstated as a student "on a probationary basis," that "[t]he first condition of [his] continuing status as a student is that [he] must successfully pass Step 1 of the United States Medical Licensing Examination [by] June 30, 2004," and further stated that plaintiff's "failure to successfully perform and comply with the guidelines that [were] being established [would] be cause for [his] dismissal as a student at Yale School of Medicine." 3/5/04 Letter [Doc. # 39, Ex. D]. Plaintiff testified that although as of March 4, 2004 he was aware that he was required to take and pass the Step I examination by June 30, 2004, he did not know that he could be dismissed for missing that exam date, rather it was his understanding that he would be dismissed if he took the examination but received a failing grade, see Morris Dep. 107-08, 110, 119; plaintiff reiterates that one reason he thought this was "because the student handbook states that the medical school allows the student until December 31 of their third year to take

the examination," <u>id</u>. at 109; Morris Aff. ¶ 42.

In June of 2004, the instructor for the test preparation course plaintiff was enrolled in informed Yale's registrar that plaintiff had enrolled in a four-week examination preparation course, but had "disengaged" from the course after one-and-a-half weeks and had been "avoidant" even during his attendance. <u>See</u> 6/9/04 E-mail [Doc. # 39, Ex. E]. Subsequently, at 11:40 p.m. on June 30, 2004, plaintiff sent an e-mail to Dean Angoff stating that his Step I exam date was July 14 and indicating that he "kn[e]w [he] was supposed to take it by June 30, but this was the only date available in St. Louis at the time [he] got [his] ticket and tried to set a date," acknowledging that he "started the process later than [he] should've" and promising that he would take the examination no later than July 14, 2004. <u>See</u> 6/30/04 E-mail [Doc. # 39, Ex. F]. However, on July 26, 2004, Dean Angoff learned that plaintiff still had not taken the Step I examination, Angoff Aff. ¶ 33; plaintiff apparently had intended to take the examination on July 30, 2004, but attests that on the morning of the examination he woke up feeling "sluggish" as a result of taking a half a sleeping pill the night before, stating "my decision not to take the test in that state was not irresponsible. This was my last attempt and I had to make sure that I was in the right physical condition to pass the exam," Morris Aff. ¶ 41. By letter dated August 2, 2004, plaintiff was

dismissed from Yale due to his failure to take the Step I examination by June 30, 2004, "the condition precedent to [plaintiff's] reinstatement as a student at Yale Medical School." 8/2/04 Letter [Doc. # 39, Ex. G].  Plaintiff attests that he first learned of his dismissal when he tried to reschedule his July 30 examination and needed to obtain permission from Yale to do so (the School certifies students for a 3-month window in which to take the examination, which period had expired in plaintiff's case).  See Morris Dep. at 115.

While plaintiff alleges in his Amended Complaint that other similarly situated Caucasian students at the School have been allowed to take the Step I examination three times before dismissal, that such students who have requested extensions of time in which to take the Step I examination have not been dismissed, and that such students have not been dismissed after failing the examination twice, Am. Compl. ¶¶ 28-30, at deposition plaintiff testified that someone in "either the admissions office or the education office or the registrar's office . . . someone on the third floor of the building" had given him this information, but he could not identify that person or when the conversation took place, he did not know "what circumstances led to [those students] being allowed to take the examination more than twice," nor did he inquire "whether any students of color were allowed to take the exam more than twice," and he stated

that other than "[t]he fact that [he] was told that there were white students that were allowed to take the exam several times without being dismissed," he had no "other basis for [his] belief that the dean acted in a discriminatory fashion," Morris Dep. at 45, 48, 177-78. However, in his affidavit, plaintiff states that he "was informed by the Registrar at the Yale Medical School that there were white students who were permitted to take the examination three or more times" and that "[t]he current registrar, Terri Tolson, told [him] that there were white students who took the Step I exam 3 times during and before her tenure," but plaintiff does not know the names of those students; plaintiff also states that Ms. Tolson told him about "a student that Yale 'perpetually' sponsors for the Step 2 exam [who] takes the exam and keeps failing it, but Yale continues to sponsor her for it [and] apparently she was not dismissed for repeated failures." Morris Aff. ¶¶ 18-19.

## II. Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and

that the undisputed facts establish [its] right to judgment as a matter of law." Rodriguez v. City of N.Y., 72 F.3d 1051, 1060 (2d Cir. 1995) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). "The duty of the court is to determine whether there are issues to be tried; in making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." Id. (citations omitted). "If reasonable minds could differ as to the import of the evidence . . . and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal quotation, citation, and alteration omitted). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (internal quotation and citation omitted).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in

dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.").  The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").  In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion.  Matsushita, 475 U.S. at 587. However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading,"

14

Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient.  <u>Matsushita</u>, 475 U.S. at 586 (citations omitted).

## III. Discussion

### A.    Section 1981 Claim

<u>Standards/Framework</u>

To prove his § 1981 claim, plaintiff must establish: (1) that he is a member of a racial minority; (2) that defendant intended to discriminate against him on the basis of his race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute, <u>see</u> <u>Jenkins v. NYC Transit Auth.</u>, No. 05-2880-CV, 2006 WL 2990242, at *1 (2d Cir. Oct. 18, 2006) (slip op.) (citing <u>Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.</u>, 7 F.3d 1085, 1087 (2d Cir. 1993)), including the right "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property," 42 U.S.C. § 1981(a).  The term "make and enforce contracts" is defined to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," <u>id</u>. § 1981(b).  The Supreme Court has specified that "[a]ny claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship,' § 1981(b), under which the plaintiff

15

has rights." <u>Domino's Pizza, Inc. v. McDonald</u>, 546 U.S. 470
(2006).  Plaintiff claims a contractual relationship between
himself and Yale not to be dismissed prior to failing the Step I
examination three times.

Section 1981 is limited to claims of intentional
discrimination.  <u>See</u> <u>General Bldg. Contractors Ass'n v. Penn.</u>,
458 U.S. 375, 391 (1982).  "A plaintiff's efforts to establish
the second element of a § 1981 claim are subject to the same
burden-shifting analysis as intentional discrimination claims
brought under Title VII of the Civil Rights Act of 1964, 42
U.S.C. § 2000 <u>et</u> <u>seq.</u>"  <u>Jenkins</u>, <u>supra</u>.  The elements of a <u>prima
facie</u> case of discrimination are: (1) membership in a protected
class; (2) satisfactory performance; (3) adverse action; (4)
circumstances supporting an inference of discrimination based on
protected class membership, <u>see</u> <u>McLee v. Chrysler Corp.</u>, 109 F.3d
130, 134 (2d Cir. 1997), and plaintiff "must provide more than
conclusory allegations of discrimination to defeat a motion for
summary judgment," <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 110 (2d
Cir. 1997).  Under the <u>McDonnell Douglas/Burdine</u> three-prong
burden-shifting framework, if plaintiff establishes a <u>prima</u> <u>facie</u>
case, the burden shifts to defendant to articulate "a legitimate,
nondiscriminatory reason" for plaintiff's adverse employment
action; "[t]his burden is one of production, not persuasion; it
can involve no credibility assessment."  <u>Reeves v. Sanderson</u>

Plumbing, 530 U.S. 133, 142 (2000) (internal citations, quotations, and alterations omitted).  It is satisfied if the proffered evidence "'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'"  Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).  "Although the burden of production shifts to the defendant, the ultimate burden of persuading the trier of fact of intentional discrimination remains at all times with the plaintiff."  Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997).

If defendant articulates a race-neutral basis for the adverse employment action(s), the burden then shifts back to plaintiff to "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination," Weinstock, 224 F.3d at 42, including by showing "that the employer's proffered explanation is unworthy of credence," Reeves, 530 U.S. at 143.  Thus, a plaintiff's prima facie case combined with sufficient evidence to find that the defendant's proffered justification is pretextual will be sufficient to survive summary judgment because a jury would be permitted to infer from such evidence that defendant's real reason for the employment action was discriminatory.  Id. at 148.

Analysis

Based on the following analysis of the record, the Court

17

concludes that even if there were evidence to support the fourth element of the prima facie case, inference of discrimination, defendant has articulated a legitimate nondiscriminatory reason for plaintiff's dismissal (poor performance) and plaintiff offers no evidence from which a reasonable inference could be drawn that this reason is pretextual or that the real reason was race discrimination.

It is undisputed that plaintiff is a member of a racial minority and defendant seems to accept the applicability of § 1981 generally (i.e., that the claimed discrimination concerned one or more of the activities enumerated in the statute), see also Bell v. Ohio State Univ., 351 F.3d 240, 252 (6th Cir. 2003) (accepting plaintiff's contention that "by virtue of her enrollment in the [Ohio State University College of Medicine], she had a contractual relationship with the Medical College"), although it maintains that there is no contract to be breached in the context of plaintiff's breach of contract claim.

Defendant argues, however, that plaintiff cannot establish a prima facie case of intentional discrimination, claiming that it is undisputed that plaintiff was not performing satisfactorily. This argument is circular in light of plaintiff's contentions that he was performing satisfactorily and that defendant's claim of poor performance is a pretext for discrimination. Focusing therefore on element (4), and accepting

plaintiff's contentions that the student handbook provides
students three opportunities to take the Step I exam, with an
ultimate deadline of December 31 of third year, that classes and
examinations were optional within the first two years, that his
tutorial with Dr. Wu was "optional" and not something he
originally wished to undertake, and that he performed well in
some of his classes/clerkships, none of these facts, even if
established, support an inference of race discrimination.
Likewise, while plaintiff contends that he did not understand
that he would be dismissed if he did not take the Step I
examination by the deadline given (ultimately June 30, 2004), and
thought dismissal would only follow a third failure, the notice
provided to him by Yale was explicit that it was a condition of
his reinstatement that he would <u>take</u> <u>and</u> <u>pass</u> the Step I
examination by June 30, 2004.  <u>See</u> 3/3/04 E-mail; 3/5/04 Letter.
Even if this requirement could be said to be not obvious from the
correspondence, it does not imply any racial discrimination,
particularly where defendant's Grievance Committee gave plaintiff
a second chance after his initial dismissal in October 2003,
finding that plaintiff had not initially received adequate notice
that he would be terminated if he failed the Step I examination a
second time, in the summer of 2003.

The only potential support for plaintiff's claim of
discrimination is his contention that similarly situated

Caucasian students were treated differently them him, but he has

no competent evidence of this fact.  His affidavit concerning the

source of this knowledge (the current registrar, Terri Tolson)

contradicts his statement at his deposition that he lacked

knowledge concerning the source or details of this information,

Morris Dep. at 45, 48, 177-78, and "a party may not create an

issue of fact by submitting an affidavit in opposition to a

summary judgment motion that . . . contradicts the affiant's

previous deposition testimony," <u>Bickerstaff v. Vassar College</u>,

196 F.3d 435, 455 (2d Cir. 1999).  Further, even if permissible

(on some refreshed recollection basis or otherwise), there simply

is no evidence in the record supporting a reasonable inference

that these Caucasian students were similarly situated to

plaintiff, <u>i.e.</u>, having similar academic records.[2]  This case can

---

[2] "To be 'similarly situated,' the individuals with whom
[plaintiff] attempts to compare [him]self must be similarly
situated <u>in all material respects</u>."  <u>Shumway v. United Parcel
Serv., Inc.</u>, 118 F.3d 60, 64 (2d Cir. 1997).  <u>Accord</u> <u>Graham v.
Long Island R.R.</u>, 230 F.3d 34, 40 (2d Cir. 2000) ("What
constitutes 'all material respects' . . . must be judged based on
(1) whether the plaintiff and those he maintains were similarly
situated were subject to the same workplace standards and (2)
whether the conduct for which the employer imposed discipline was
of comparable seriousness."); <u>see</u> <u>also</u> <u>Guerrero v. Conn. Dep't of
Children & Families</u>, 315 F. Supp. 2d 202, 210 (D. Conn. 2004)
(granting motion for summary judgment, finding that plaintiff was
not similarly situated to the comparator where "the comparator
did not have the history of past disciplinary problems that
[plaintiff] had"); <u>Padilla v. Harris</u>, 285 F. Supp. 2d 263, 270
(D. Conn. 2003) (granting motion for summary judgment noting
"[p]rior disciplinary problems may be sufficient to justify
deferential treatment of otherwise similarly situated
employees").

thus be compared to that of <u>Bell v. Ohio State University</u>, <u>supra</u>.

In <u>Bell</u>, plaintiff offered deposition testimony in which she stated "that she knew Caucasian students were permitted to retake exams, but she was not given that opportunity," but plaintiff also testified that she could not recall any students "who had missed the final exam for the internal medicine rotation [or] who had been permitted to take makeup exams in internal medicine after missing the final," "she said she knew of [a student who had been allowed to take makeup exams in another clinical rotation] but could not recall the student's name, the clinical rotation at issue, or any other specific detail about the student or the rotation [or even] whether this unidentified student was a member of a minority race." 351 F.3d at 253-54. The <u>Bell</u> court held that there was no evidence supporting an inference of intentional discrimination on the basis of race, and found "[t]o the contrary, the evidence is overwhelming that Ms. Bell did not meet the academic requirements of the Medical College and was withdrawn in 1994; the defendants reinstated her and went to great lengths to give Ms. Bell every opportunity to do those things which were required of her to earn her medical degree; when she failed and refused to comply with the requirements, the defendants engaged in three levels of committee review of that non-compliance; in 1997, after Ms. Bell had complied with none of those requirements, the defendants dismissed her for purely

academic reasons." Id. at 254.[3]

The Court thus finds nothing in the record supporting plaintiff's claim of intentional race discrimination which rises above mere speculation or conclusory assertion based on a belief or hunch. See Boies v. N.Y. Univ., No. 05-6793-CV, 2006 WL 2374240, at *1 (2d Cir. Aug. 14, 2006) (slip op.) ("[Plaintiff]'s mere speculation was insufficient to permit a reasonable inference that [defendant's] proffered reasons for revoking [plaintiff's] tenure and terminating his employment were illegitimate or, otherwise, pretexts."); Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004) (genuine issue of material fact not created "merely by the presentation of assertions that are conclusory"). Accordingly, defendant's Motion as to plaintiff's § 1981 claim will be granted.

**B. Remaining Common Law Claims**

Having granted defendant's Motion as to plaintiff's federal

---

[3] The record concerning plaintiff's interaction with Dr. Childs, which incident plaintiff believes stemmed from racial animus, does not support an inference of any discrimination by Yale in dismissing plaintiff. Dr. Childs was a resident in orthopedic surgery at Yale-New Haven Hospital, he was not a member of the Yale faculty, Morris Dep. at 24, and there is no evidence that he had any ability to influence, or was involved in any way in, the decision to dismiss plaintiff. Plaintiff's contention in his affidavit that Dean Angoff/Yale engaged in retaliatory treatment in response to plaintiff's report of the Dr. Childs incident and consideration of writing an article for the Yale student newspaper about racism, see Morris. Aff. ¶¶ 16-17, is inapposite because there is no evidence suggesting that these circumstances played any role in plaintiff's dismissal.

§ 1981 claim, the Court declines to exercise supplemental jurisdiction over plaintiff's common law claims. See Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 103 (2d Cir. 1998) ("28 U.S.C. § 1367(c)(3) . . . permits a district court, in its discretion, to decline to exercise supplemental jurisdiction over state law claims if it has dismissed all federal claims. Further, the Supreme Court, in Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988), announced that when all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice.").

## IV. Conclusion

For the foregoing reasons, defendant's Motion for Summary Judgment [Doc. # 36] is GRANTED. The Clerk is directed to CLOSE this case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this 14th day of February, 2007.**